IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HERMAN BENSON, JR., Individually and On Behalf of All Others Similarly Situated, | § § § § | |
| Plaintiffs, | § § | |
| | § | C.A. No. 3:08-CV-01735-G |
| v. | § § | |
| CSA – CREDIT SOLUTIONS OF AMERICA, INC., | § § § | |
| Defendant. | § § | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO VACATE ARBITRATOR'S CLAUSE CONSTRUCTION
AWARD OR STAY THE PROCEEDINGS
PURSUANT TO 9 U.S.C. §§ 10, 12**

**J. Derek Braziel**
*Attorney in Charge*
State Bar No. 00793380
**Meredith Matthews**
Texas Bar No. 24055180
Lee & Braziel, L.L.P.
1801 N. Lamar Street, Suite 325
Dallas, Texas 75202
(214) 749-1400 phone
(214) 749-1010  fax
www.overtimelawyer.com

**ATTORNEYS FOR CLAIMANTS**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of September, 2010, a copy of the foregoing document was electronically filed.  Notice of this filing will be sent to counsel of record for all parties by operation of the Court's Electronic Filing System.

/s/ J. Derek Braziel
J. Derek Braziel

# TABLE OF CONTENTS

- Cover Page .................................................................................................................. i
- Table of Contents ....................................................................................................... ii
- Table of Authorities .................................................................................................. iii
- Motion for Notice to Potential Plaintiffs and Conditional Certification ................... Page 1
- I. Introduction ........................................................................................................... Page 1
- II. Factual Background .............................................................................................. Page 2
  - A. Procedural History ........................................................................................ Page 2
  - B. The Complaint .............................................................................................. Page 2
  - C. Claimant Files a Request for Clause Construction .................................... Page 3
  - D. The Arbitrator's Clause Construction Award. ....................................... Page 3
- III. Argument .............................................................................................................. Page 4
  - A. Standard of Review ........................................................................................ Page 4
  - B. The Arbitrator's Award Must be Upheld Under FAA § 10(a)(4) .......... Page 6
  - C. The Arbitrator, as Direct by *Stolt-Nielsen*, Looked at the Contractual Language and Not Mere Silence to Determine the Parties' Intent to Permit Class/Collective Arbitration ...................................................... Page 13
  - D. The Arbitrator is the Proper Authority to Decide this Issue ................. Page 14
  - E. Manifest Disregard is Not a Proper Ground for Review of the Arbitrator's Decision ................................................................................ Page 13
  - F. Even Were the Court to Apply a Manifest Disregard Analysis, the Arbitrator's Contract Construction Award Must be Upheld ................ Page 17
  - G. CSA's Merits Arguments Contained in Its Manifest Disregard Analysis are Irrelevant and Incorrect ...................................................... Page 18
    1. The Arbitrator's Reading of the Broad Language of the Arbitration Agreement was Correct ......................................................... Page 18
    2. CSA's Argument That The Arbitrator Improperly Relied on § 204 of the Restatemetn (Second) of Contracts is Refuted by *Stolt-Nielsen* .................................................................................... Page 20
    3. The Arbitrator's Use of *Expressio Unius Est Exclusio Alterius* was Proper ............................................................................................... Page 21
    4. CSA's Election to Compel a Collective Action to Arbitration Shows its Intent to Proceed in Arbitration on Collective Basis . Page 22
    5. The Arbitrator's Decision <u>Prevents</u> Significant Injustice to CSA Rather Than Causing It ......................................................................... Page 24
  - H. CSA's Request to Stay Should be Denied ........................................... Page 25
- IV. Conclusion .......................................................................................................... Page 25

## Cases

*American Eagle Airlines, Inc. v. Airline Pilots Ass'n*, 343 F.3d 401 (5th Cir. 2003) ........................5

*American Laser Vision,* 487 F.3d 255, 258 (5th Cir. 2007) ................................................6

*Apache Bohai Corporation LDC v. Texaco China BV,* 480 F.3d 397 (5th Cir. 2007) ....................6

*Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377 (5th Cir. 2004) ...........................................17

*Citigroup Global Markets, Inc. v. Bacon*, 562 F.3d 349 (5th Cir. 2009) ...............................4, 16, 17

*Downer v. Siegel*, 489 F.3d 623 (5th Cir. 2007) ................................................................5

*Granite Rock v Int'l Brotherhood of Teamsters*, 130 S. Ct. 2847 (2010) .................................15, 16

*Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444 (2003) ........................................14, 15, 16, 24

*Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 585 (2008) ...........................................5, 17

*Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165 (1989) ................................................25

*Jock v. Sterling Jewelers, Inc.*, 2010 WL 2898294 (S.D.N.Y. July 26, 2010) ...............................20

*Kergosien v. Ocean Energy, Inc.,* 390 F.3d 346 (5th Cir. 2004) ...............................4, 5, 6, 13, 16

*Major League Baseball Players Association v. Garvey,* 532 U.S. 504, 121 S. Ct. 1724, 149 L.Ed.2d 740 (2001) ................................................................................................6, 13

*McCarthy v. Citigroup Global Markets, Inc.*, 463 F.3d 87 (1st Cir. 2006) ......................................5

*Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.,* 138 F.3d 160 (5th Cir.1998) ..........6

*NetKnowledge Technologies, L.L.C. v. Rapid Transmit Technologies, a/k/a WaKuL, Inc.*, 2007 WL 518548 (N.D. Tex. February 20, 2007) ........................................................................4, 18

*Pedcor Mgt Co. Inc. Welfare Benefit Plan v. Nations Personnel of Texas, Inc.*, 343 F.3d 355 (5th Cir. 2003) ..........................................................................................................14, 15, 16, 24

*Reliastar Life Ins. Co. of NY v. EMC Nat'l Ins. Co.,* 564 F.3d 81 (2nd Cir. 2009) ............................5

*Stolt-Nielsen v. Animalfeeds International Corp.*, 130 S. Ct. 1758 (2010) ....1, 3, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 23, 26

*Technology Corp. v. Swanson* 959 S.W.2d 171 (Tex. 1997) ........................................................18

*U.S. Energy Corp. v. Nukem, Inc.,* 400 F.3d 822 (10th Cir. 2005) ..................................................5

*United Paperworkers Int'l Union v. Miscoi,* 484 U.S. 29 (1987)......................................................5

*Vandenavond v. i2 Technologies, Inc.*, 2008 WL 5336300 (N.D. Tex. Dec. 19, 2008, Fish, J.).5, 13

*Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200 (2nd Cir. 2002) ..........................................4

**Statutes**

Fair Labor Standards Act, 29 U.S.C. § 216(b).......................................................................2, 22, 25

Fair Labor Standards Act, 29 U.S.C. § 201 ...................................................................................2

Federal Arbitration Act, 130 S. Ct. .......................................................................................2, 4, 8

New York Law, 130 S. Ct. ..............................................................................................8, 9, 10, 12

**Other Authorities**

RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981) ......................................................11, 18, 20

# I.     INTRODUCTION

After asking this Court to compel the underlying FLSA collective action into arbitration, Credit Solutions of America, Inc. ("Respondent" or "CSA") now returns to ask the Court to overturn a well-reasoned and thorough opinion issued in accordance with the very process CSA selected and demanded the Parties follow.  CSA's Motion to Vacate is, in short, a transparent attempt to get a "second bite at the apple" on an issue it has already presented, argued, and lost. CSA disguises its appeal in the language of an arbitrator run amuck and dispensing his own brand of industrial justice.  Nothing could be further from the truth.

CSA has the mistaken belief that the Supreme Court's decision in *Stolt-Nielsen v. Animalfeeds International Corp.*, 130 S. Ct. 1758, changed the rules for arbitrators considering whether a class or collective arbitration is permitted or agreed to by parties to an arbitration agreement.  CSA goes further and agues throughout its Motion that the Arbitrator, who had the benefit of the *Stolt-Nielsen* decision before him and heard arguments from both sides on the issues raised by that decision, somehow exceeded his powers by doing the one thing the Supreme Court's decision commanded arbitrators to do – look at the language of the contract in view of applicable law and circumstances and determine if the parties intended to arbitrate class or collective actions. That is precisely what the arbitrator did in this case.  Unlike the underlying dispute in *Stolt-Nielsen* where the parties agreed there was "no agreement" to arbitrate class claims, the parties to the present arbitration agreement intended to include class and collective arbitrations and the arbitrator identifies the necessary "contractual basis" for finding this intent.  Given the extremely narrow scope of review applicable to the Arbitrator's decision, and the Arbitrator's careful analysis of the contract in light of *Stolt-Nielsen* and Texas law, the Arbitrator did not violate Section 10(a)(4) of the Federal Arbitration Act.  As such, and for the other reasons set forth below, the Court should deny the Motion to Vacate.

1

## II.        FACTUAL BACKGROUND

### A.       <u>Procedural History</u>

On October 1, 2008, Claimant Herman Benson, Jr. originally filed this action in this Court

as a "collective action" brought under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*,

("FLSA") by current and former employees of CSA.  At the time of the filing, Benson was joined

in the case by opt-in plaintiff Linda Francis.  (Doc. Entry No. 5).  Even before filing an answer, on

October 22, 2008, CSA moved to stay the litigation and compel the Parties to arbitration pursuant

to an arbitration agreement between CSA and Benson.  (Doc. Entry No. 7).  While the Motion was

pending, an additional individual (Mark Woodson) consented to be an opt-in plaintiff pursuant to

the opt in requirements of 29 U.S.C. § 216(b).  (Doc. Entry No. 13).  On November 19, 2008, this

Court granted CSA's motion and referred the entire collective action to arbitration.  (Doc. Entry

No. 15).  On November 11, 2008, Claimant filed his demand for arbitration with AAA.  (Exh. A)

### B.       <u>The Complaint</u>

As described in the Complaint, Claimant contends that CSA misclassifies the group of

employees who sell the company's financial services to the company's prospective clients.  These

individuals are typically referred to as Debt Consultants.  CSA provides financial services to a

limited group of individuals outside its local community, who generally seek out CSA's financial

assistance via the internet.  These services are primarily negotiating credit card debt and other

consumer debt down to manageable levels for a limited group of consumers and advising these

clients about their financial debt practices.

These Debt Consultants[1] are paid on a commission-only basis (shortly after the filing of

this litigation a modified base plus commission plan was put in place) and, just recently, the

---

[1]        The term Debt Consultant is used broadly here to describe those individuals who sold CSA's financial
services to CSA clients and who were paid in whole or in part on a commission basis.  Over time, the precise job title
has changed.

2

company began to pay Debt Consultants overtime for hours they work in excess of 40 per week. For individuals under the modified plan, these employees were not paid overtime at time-and-a-half of the regular rate for their overtime work each week for a short period of time until CSA changed its practices and began, as far as Claimant can tell based on limited information, paying proper overtime to its Debt Consultants.

It bears noting that CSA contends its Debt Consultants are universally exempt from the overtime requirements of the FLSA.  This classwide exemption defense makes this matter particularly well-suited for class treatment.

**C.**     **Claimant Files a Request for Clause Construction**

On February 26, 2010, Claimant filed a Clause Construction Memorandum, seeking to have the Arbitrator determine that CSA's employee arbitration agreement allows this case to proceed on a collective or class basis.  (Exhibit B)**.**  On or about, April 27, 2010, prior to Respondent filing its Response to the Clause Construction Memorandum, the Supreme Court issued its ruling in *Stolt-Nielsen v. Animalfeeds International Corp.*, 130 S. Ct. 1758.  Thereafter, both Respondent in its Response and Claimants in their Reply had the opportunity to address the *Stolt-Nielsen* ruling in their presentations to the Arbitrator.  (Exhibit C, Claimant's Reply).  Additionally, following the parties' briefing, the Arbitrator held a telephone hearing with the parties' counsel and questioned both parties on issues raised in *Stolt-Nielson* and how those issues apply to the current matter.

**D.**     **The Arbitrator's Clause Construction Award**

On or about July 6, 2010, after considering *Stolt-Nielsen*, the language of the arbitration agreement, and the authorities presented by the Parties, the Arbitrator in this matter issued his Partial Final Clause Construction Award (PFCCA or Award), finding that "it was the intent of the parties to arbitrate all disputes regarding employment, of every kind whatsoever, and therefore . . . that the arbitration agreement in this case authorizes a collective and/or class arbitration."  (Exhibit

3

D, PFCCA at p. 8).  The specific findings and analyses critical to the present Motion to Vacate are

detailed *infra*.

## III.    ARGUMENT

**A.    <u>Standard of Review</u>**

Pursuant to the Federal Arbitration Act (FAA), a district court's ability to set aside an

arbitration award is limited to four specific grounds.  9 U.S.C. § 10 (a).

    (1)  where the award was procured by corruption, fraud or other undue means;

    (2)  where there was evident partiality or corruption in the arbitrators, or either of them;

    (3)  where the arbitrators were guilty of misconduct  . . . or any other misbehavior by which
        the rights of any party have been prejudiced; or

    (4)  where the arbitrators exceeded their powers or so imperfectly executed them that a
        mutual, final and definite award upon the subject matter submitted was not made.

*See Kergosien v. Ocean Energy, Inc.,* 390 F.3d 346, 353 (5th Cir. 2004).

These statutory grounds are the <u>exclusive</u> means for vacatur of an arbitrator's decision.

*Citigroup Global Markets, Inc. v. Bacon*, 562 F.3d 349, 355 (5th Cir. 2009).  Only one of these four

grounds has been raised by Respondent in this matter – that the Arbitrator exceeded his powers.

(*See* Defendant's Motion at p. 10).  Courts have consistently accorded the "narrowest of readings"

to this provision.  *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 220 (2nd Cir. 2002).

An arbitration award is subject to "extreme" deference and the scope of the review is

"extraordinarily narrow."  *NetKnowledge Technologies, L.L.C. v. Rapid Transmit Technologies*,

2007 WL 518548 *1 (N.D. Tex. February 20, 2007).  "Indeed, the standard of review of arbitral

awards 'is among the narrowest known to the law.'"  *U.S. Energy Corp. v. Nukem, Inc.,* 400 F.3d

822, 830 (10th Cir. 2005) (citations omitted).  All doubts whether an arbitrator has exceeded his

authority must be resolved in favor of the arbitrator.  *Id.*;  *Kergosien v. Ocean Energy, Inc.*, 390

F.3d 346, 355 (5th Cir. 2004).  Put otherwise, "[I]f there is ambiguity as to whether an arbitrator is

acting within the scope of his authority, that ambiguity must be resolved in favor of the arbitrator." *American Eagle Airlines, Inc. v. Airline Pilots Ass'n*, 343 F.3d 401, 405 (5th Cir. 2003).

Moreover, vacating an arbitrator's award may not be based on whether the arbitrator correctly decided the issue. *Reliastar Life Ins. Co. of NY v. EMC Nat'l Ins. Co.,* 564 F.3d 81, 86 (2nd Cir. 2009). If the arbitrator offered a "barely colorable justification" for the award, or is "even arguably construing or applying the contract and acting within the scope of his authority" a court may not overturn the award, even if convinced that the arbitrator has made a serious mistake. *Id.* Where there are differing interpretations of a clause, the arbitrator is free to choose between them and the fact that he does not choose the other, even if the court would have done so, does not allow vacation of the arbitration award. *Downer v. Siegel*, 489 F.3d 623, 627 (5th Cir. 2007).

"[C]ourts 'do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.'" *McCarthy v. Citigroup Global Markets, Inc.*, 463 F.3d 87, 93-94 (1st Cir. 2006) (*quoting United Paperworkers Int'l Union v. MiscoI,* 484 U.S. 29, 38 (1987)). "Even where such error is painfully clear, courts are not authorized to reconsider the merits of arbitration awards." *Id.* at 94.

In fact, this very Court set forth the extremely narrow scope of review in 2008 in *Vandenavond v. i2 Technologies, Inc*., 2008 WL 5336300 (N.D. Tex. Dec. 19, 2008, Fish, J.):

> In fact, the Supreme Court recently reemphasized the narrowness of the available grounds for vacatur. See *Hall Street Associates, L.L.C. v. Mattel, Inc.,* --- U.S. ----, 128 S. Ct. 1396, 1400, 170 L.Ed.2d 254 (2008) (holding that the statutory bases for vacatur under the FAA are exclusive). Even before *Hall Street,* the Fifth Circuit had fleshed out the very narrow standard of review, stating that an award must be upheld as long as it "is rationally inferable from the letter or purpose of the underlying agreement." See *American Laser Vision,* 487 F.3d at 258 (citing *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.,* 138 F.3d 160, 164-65 (5th Cir.1998)). Even "the failure of an arbitrator to correctly apply the law is not a basis for setting aside an arbitrator's award." See *id.* (citing *Kergosien,* 390 F.3d at 356).

> Additionally, courts are not permitted to weigh the merits of the grievance or consider whether there is equity in a particular claim. *Kergosien,* 390 F.3d at 358.

5

An arbitrator's factual findings "are unreviewable." *Apache Bohai Corporation LDC v. Texaco China BV,* 480 F.3d 397, 407 (5th Cir. 2007). Courts must accept arbitrators' factual findings as true. *Id.* at 409. The Supreme Court has stated that "[w]hen an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's improvident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award." *Major League Baseball Players Association v. Garvey,* 532 U.S. 504, 509, 121 S. Ct. 1724, 149 L.Ed.2d 740 (2001). In short, courts are "not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement." *Kergosien,* 390 F.3d at 357. "Even 'serious error' on the arbitrator's part does not justify overturning his decision, where, ... he is construing a contract and acting within the scope of his authority." *Kergosien,* 390 F.3d at 358 (quoting *Major League Baseball,* 532 U.S. at 510). All the law requires is that the award is "in some logical way ... derived from the wording or purpose of the contract." *Kergosien,* 390 F.3d at 353.

Id. at *3

Applying this narrowest of standards of review in this matter, the Arbitrator's Clause Construction Award must be upheld because the Arbitrator took great care to analyze the parties' agreement taking into consideration Texas contract law and recent Supreme Court authority.

**B.      The Arbitrator's Award Must be Upheld Under FAA § 10(a)(4)**

Respondent argues basically that this case is nearly identical to and stands on all fours with *Stolt-Nielson* and thus, the Arbitrator's decision in this case – like the panel's decision in *Stolt-Nielson* – exceeded his powers by "stray[ing] from interpretation and application of the agreement and effectively dispens[ing] his own brand of industrial justice." (Defendant's Motion at pp. 11-12). Respondent could not be more wrong.

To understand why Respondent has missed the mark so widely, one must first understand what *Stolt-Nielsen* is and what it is not, and understand the very real differences between *Stolt-Nielsen* and the present case. The Arbitrator in this case understood all of these things well and ruled accordingly. Therefore, his clause construction award should not and, indeed, under the very narrow standard of review available to this Court, cannot, be vacated.

*Stolt-Nielsen* does not, as Respondent seeks to portray it, hold that class arbitration is

permissible only when an arbitration agreement expressly provides for it[2] – which would work a fundamental change to contract law.  Neither does *Stolt-Nielsen* hold that silence constitutes a *per se* exclusion of class and/or collective arbitration, nor that the parties cannot be found to have agreed to class and/or collective procedures even though the parties never discussed them (as would always be the case in a contract of adhesion in which *no* terms are discussed by its very nature).[3]  Instead, *Stolt-Nielsen* stands for the common sense and rather uncontroversial principle that an arbitrator should look to the terms of the agreement and interpret them using applicable law to discern the intent of the parties.  That is what the Arbitrator did in the instant case.

The *Stolt-Nielsen* opinion opens with an explanation for its grant of certiorari:  "We granted certiorari in this case to decide whether imposing class arbitration on parties whose arbitration clauses are 'silent' on that issue is consistent with the Federal Arbitration Act (FAA)."  130 S. Ct. at 1764.  The opinion that follows resoundingly answers:  "it depends."

The Court first instructs what the panel in that case should have done:  "Because the parties agreed their agreement was 'silent' in the sense that they had not reached any agreement on the

---

[2]     Justice Ginsberg noted, without opposition or refutation by the majority, that "the Court does not insist on express consent to class arbitration. Class arbitration may be ordered if 'there is a contractual basis for concluding that the part[ies] *agreed*' 'to submit to class arbitration'". *Id*. at 1783 (citations omitted).  As the majority opinion and dissent both note, however, the Court had "no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration."  *Id*. at 1776., n. 10.  Thus, where there is contractual language that supports finding an agreement on class arbitration, class arbitration is authorized.  Interpreting the contractual language in accordance with the applicable rules of contract interpretation is the task specifically undertaken by the Arbitrator in this matter.

[3]     One critical difference between the present matter and *Stolt-Nielsen* is that *Stolt-Nielsen* involved a bilateral contract between "sophisticated business entities" (and where the drafter/selector of the contract was the one seeking class arbitration).  *Id*. at 1775, 1783.  Although the majority opinion openly notes its disagreement with the dissent on several points, the majority does not disagree with Justice Ginsberg's identification of particular "stopping points" in the majority's opinion.  *Id*. at 1783.  One critical "stopping point" is that the *Stolt-Nielsen* holding does not apply to contracts of adhesion like the one CSA forces every new hire to sign or acknowledge before they can begin work for the company.  The dissent notes, without opposition, that "[b]y observing that 'the parties [here] are sophisticated business entities,' and 'that it is customary for the shipper to choose the charter party that is used for a particular shipment,' the Court apparently spares from its affirmative-authorization requirement contracts of adhesion presented on a take-it-or-leave-it basis."  *Id*. at 1783.  Here, the parties are not sophisticated business entities with decades of negotiating history behind them.  It is equally important that, in *Stolt-Nielsen*, the party seeking to use class arbitration was the party who selected the particular agreement.  This is in stark contrast to the instant matter where it was CSA who drafted the arbitration agreement and presented it to the class members to assent to on an all-or-nothing basis.

issue of class arbitration, the arbitrators' proper task was to identify the rule of law that governs in that situation. Had they engaged in that undertaking, they presumably would have looked either to the FAA itself or to one of the two bodies of law that the parties claimed were governing, *i.e.*, either federal maritime law or New York law." 130 S. Ct. at 1768.

The Court then took the arbitration panel to task for not doing so. "Rather than inquiring whether the FAA, maritime law, or New York law contains a 'default rule' under which an arbitration clause is construed as allowing class arbitration in the absence of express consent, the panel proceeded as if it had the authority of a common-law court to develop what it viewed as the best rule to be applied in such a situation." 130 S. Ct. at 1768-69.

This point was re-emphasized by the Court when it said, "instead of identifying and applying a rule of decision derived from the FAA or either maritime law or New York law, the arbitration panel imposed its own policy choice and thus exceeded its powers." 130 S. Ct. at 1770.

The Court then pronounced that "a party may not be compelled under the FAA to submit to class arbitration **unless there is a contractual basis for concluding** that the party *agreed* to do so. 130 S. Ct. at 1775 (emphasis added).

Having made these statements, had the Court intended that arbitration agreements silent on the issue of class arbitration could not be interpreted to include class arbitration, one would have expected the Court in *Stolt-Nielsen* to then abruptly close its opinion with words to the effect that because the arbitration agreement at issue was silent on the issue of class-action arbitration, none can be compelled. However, the Court did not conclude its opinion at this point – thus, leading to the obvious conclusion that under certain circumstances, even in the face of silence, class-arbitration can be authorized. Indeed, the Court's words that follow make that clear:

> "In certain contexts, it is appropriate to presume that parties that enter into an
> arbitration agreement implicitly authorize the arbitrator to adopt such procedures as
> are necessary to give effect to the parties' agreement. Thus, we have said that ' "
> 'procedural' questions which grow out of the dispute and bear on its final

disposition" are presumptively not for the judge, but for the arbitrator, to decide.'"

130 S. Ct. at 1775.

"'When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.' Restatement (Second) of Contracts §204 (1979)."

*Id.*

"An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may infer *solely* from the fact of the parties' agreement to arbitrate." (Emphasis added.)

*Id.*

The Court went on to say:   "We think that the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties *mere* silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings."   130 S. Ct. at 1776 (emphasis added).

The words "solely" and "mere" are emphasized above because they demonstrate that something other than silence, if it exists, can constitute consent to resolve the parties' disputes in class proceedings.   In other words, while silence alone does not either *permit* or *prohibit* class-action arbitration, something else can.   And, significantly, the footnote, (fn. 10), that the Court added at the end of the last quotation is telling.   That critical footnote reads:

"We have no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration.  Here, as noted, the parties stipulated that there was "no agreement" on the issue of class-action arbitration."

130 S. Ct. at 1776 n.10.

Footnote 10's comments, attached to a pronouncement that "mere silence" cannot constitute consent to a class proceeding, surely signals that if something else exists, the parties' intent to pursue class-action arbitration can be found.   Harkening back to the Court's own words, it is clear that this "something else" pursuant to which class arbitration may be ordered is "a

contractual basis for concluding that the par[ties] *agreed*" "to submit to class-arbitration."  130 S. Ct. at 1775.

This is exactly what the Arbitrator did in this case.  He based his Award on that "something else" identified by the Supreme Court in *Stolt-Nielsen* as sufficient – a contractual basis.  Taking into consideration the *Stolt-Nielsen* decision, the Arbitrator examined the agreement under Texas State Law and determined that in this case there was in fact a contractual basis for concluding that the parties had agreed to submit to class-arbitration.  The Award in this case clearly articulates a contractual basis, anchored in the language of the agreement and Texas contract law, for its determination that the broad language in the agreement, drafted by CSA without negotiation or input from its employees, must be construed against CSA to permit class arbitration.

The Arbitrator began his Contract Construction Award by analyzing *Stolt-Nielsen*.  In so doing, the Arbitrator specifically recognized that *Stolt-Nielsen* involved an arbitration agreement "entered into between two parties in an arms-length negotiation" and that the Supreme Court "placed great weight on the fact that the parties stipulated they had reached no agreement on whether this arbitration clause authorized a class arbitration."[4]  (PFCCA at 3).

The Arbitrator then specifically recognized that *Stolt-Nielsen* prohibited finding an agreement to resolve disputes in class proceedings from "mere silence."[5]

Because parties' "mere silence on the issue of class-action arbitration" cannot constitute "consent to resolve . . . disputes in class proceedings," the Court held that

---

[4]     No such stipulation exists here.  Claimant maintains that the arbitration clause authorizes class or collective arbitrations.

[5]     CSA argues that the fact that the Arbitrator found that the arbitration agreement was "silent" on the issue of class and/or collective arbitration and that the parties never discussed the issue of class and/or collective arbitration puts this case on all fours with *Stolt-Nielsen*.  CSA overreaches.  First, the parties in *Stolt-Nielsen* had stipulated that the agreement there was silent in the sense not only that the clause made no reference to class arbitration, but that "there[ had] been no agreement that ha[d] been reached on that issue."  130 S. Ct. at 1766.  There was and is no such stipulation in this case.  When the Arbitrator in this case referred to the arbitration agreement as "silent" on the issue, he was obviously making reference to the fact only that that the agreement made no express reference to class arbitration.  Second, CSA cannot supply a "no agreement" finding from the Arbitrator's reference to the lack of discussion between the parties on this issue.  There Arbitrator was merely stating the obvious that in a contract of adhesion, which he found the arbitration agreement to be, the parties understandably had not discussed this issue, or any issue for that matter.

10

> it is necessary to determine whether the "parties *agreed to authorize* class arbitration." According to the Court, this is properly done by giving "effect to the contractual rights and expectations of the parties," and by considering the applicable rule of law which would govern in such situations.

(PCCA at 3-4).

The Arbitrator then turned to do specifically what the *Stolt-Nielsen* Court had instructed. Identifying the arbitration agreement in this matter as an adhesion contract, the Arbitrator stated: It is safe to assume that *in this adhesion arbitration contract*,[6] the parties did not discuss whether their arbitration agreement would authorize class arbitration.

The Arbitrator then noted that under the circumstances, the RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981) offered guidance. It is not without significance that the *Stolt-Nielsen* Court itself referred specifically to § 204 in stating that "[i]n certain contexts it is appropriate to presume that parties that enter into an arbitration agreement implicitly authorize the arbitrator to adopt such procedures as are necessary to give effect to the parties' agreement." 130 S. Ct. at 1775.

The Arbitrator then went on to analyze the following question: Did the parties intend to arbitrate all disputes of every kind, even disputes that might involve a collective or class arbitration? The Arbitrator answered this question in the affirmative for three reasons.

(1)    The agreement to arbitrate **any dispute or claim** is "broad," indeed so broad that it is "difficult to imagine broader language," thus evidencing an intent to "authorize arbitration in the broadest category of cases."[7] (PFCCA at 6).

---

[6]    Not surprisingly, the phrase "adhesion contract" is omitted in every reference by CSA to this finding by the Arbitrator.

[7]    CSA notes that the contract language at issue in *Stolt-Nielsen* was "broad" as well and asks what it intends to be a rhetorical question: "one must ask why the arbitration agreement at issue in *Stolt-Nielsen* . . . would not have been subject to the same finding." While CSA intended the question to be rhetorical, that very question is expressly answered in the *Stolt-Nielsen* opinion itself: "The panel also commented on the breadth of the language in the [agreement], . . . but . . . in light of the parties' stipulation, . . . the particular wording of the [agreement] was quite

(2)     The arbitration agreement specifically excludes one category of disputes but does not exclude class claims.[8]  (PFCCA at 6-7).

(3)     CSA filed a motion to compel arbitration in this Court knowing that Claimant had brought a collective action, yet "without making any distinction between Claimant's individual claim and his request to proceed in a collective action under the FLSA." (PFCCA at 8).

While Claimants would, unsurprisingly, argue that the Arbitrator got it right, that issue is not before this Court.  This Court cannot let itself be dragged, as Respondent attempts to do, into the quagmire of deciding whether or not the Arbitrator was correct in his ruling.  Having analyzed *Stolt-Nielsen*, then having as *Stolt-Nielsen* directed, grounded his Award in the broad language of the adhesion contract drafted by CSA and in Texas contract law in interpreting that contractual language, it simply cannot be said that the Arbitrator exceeded his authority.  That, alone, ends the inquiry under the FAA.  As this Court reiterated in denying a motion to vacate an arbitration award in 2008, where, as here, the Arbitrator "is construing a contract and acting within the scope of his authority[]" *Kergosien*, 390 F.3d at 358 (quoting *Major League Baseball*, 532 U.S. at 510), [a]ll the law requires is that the award is "in some logical way ... derived from the wording or purpose of the contract."  *Vandenavond*, 2008 WL 5336300 *3 (N.D. Tex. Dec. 19, 2008, Fish, J.).  Consequently, the Court should deny Defendant's Motion to Vacate.

**C.     The Arbitrator, as Directed by *Stolt-Nielsen*, Looked at the Contractual Language and Not Mere Silence to Determine the Parties' Intent to Permit Class/Collective Arbitration.**

CSA contends the arbitrator exceeded his authority by finding consent for class/collective arbitration even though he indicated the agreement was silent and the parties never discussed class

---

beside the point." 130 S. Ct. at 1770.  Thus, the answer to CSA's question is simple:  the parties' stipulation in *Stolt-Nielsen* made the language of the agreement irrelevant.

[8]     The Arbitrator found this significant because it demonstrated that CSA, "the drafter of the arbitration agreement, . . . knew how to exclude certain disputes from the scope of the arbitration agreement, but apparently chose not to exclude collective and class arbitrations.  The Arbitrator also found it significant because in 2008 "it was not uncommon for certain employers and others to expressly restrict arbitration to individual claims."

arbitration. (Motion at 15-16). In essence, CSA argues that the absence of a specific, express term or the absence of a discussion means there can be, as a matter of law, no agreement on class arbitration. CSA misunderstands the inquiry. The very next sentence quoted by CSA explains, as detailed more fully in the previous section of this Response, why the Arbitrator did not stop at mere silence as CSA would want. (Motion at 15). The Arbitrator was tasked, under *Stolt-Nielsen*, with interpreting the contractual language and determining if there was a "contractual basis" for concluding that the parties agreed to class/collective arbitration. It was not the fact that the arbitration agreement in *Stolt-Nielsen* was <u>silent</u> that precluded a finding of agreement to allow class arbitration, it was that "the arbitration panel imposed class arbitration even though **the parties concurred that they had reached "no agreement" on that issue**." *Stolt-Nielsen*, 130 S. Ct. at 1775 (emphasis added). In short, the panel erred in finding an agreement when the <u>parties</u> conceded there was "no agreement."

In this matter, Claimant has never conceded there was "no agreement" or that the Arbitration Agreement is "silent." Claimant's briefing (incorporated here by reference as if fully set forth and attached as Exhibits B & C to this Response) explains precisely how the opposite is true based on the language of the arbitration agreement at issue here. The arbitrator was duty bound to review this language and he did so. In doing so, he determined that the language of the agreement, among other things, showed intent to agree to class/collective arbitration. Had the Arbitrator stopped short as CSA suggests, he would have been guilty of the same error the *Stolt-Nielsen* panel committed, only in the opposite direction. While this may be the result desired by CSA, and while CSA or this Court may disagree with the Arbitrator's view of the contractual language, he did not exceed his powers by reviewing the language, and his decision should not be vacated.

**D.      The Arbitrator is the Proper Authority to Decide this Issue**

CSA contends the Arbitrator is not the appropriate decision maker concerning the class arbitrability issue after *Stolt-Nielsen*, and that, instead, this Court should determine the matter *de novo*. CSA reads the *Stolt-Nielsen* Court's discussion of the fragmented opinion in *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444 (2003) as holding that *Bazzle* did not determine that the arbitrator is the correct decision-maker as to the arbitrability of class claims, thereby effectively overruling the Fifth Circuit's holding in *Pedcor Mgt. Co. Inc. Welfare Benefit Plan v. Nations Personnel of Texas, Inc.*, 343 F.3d 355 (5th Cir. 2003), and thus holding that the District Court is the proper decision maker on the arbitrability of class claims. As usual, CSA misses the mark by overreaching in its representation of the *Stolt-Nielsen* holding.

Had the Court in *Stolt-Nielsen* intended to hold that courts are the proper decision-makers of the arbitrability of class claims, it would have expressly said so. It did not. Even after a lengthy discussion of *Bazzle*, the *Stolt-Nielsen* court did not "revisit that question" because it was not before the Court. *Stolt-Nielsen* 130 S. Ct. at 1772. To suggest that *Stolt-Nielsen* somehow overruled *Pedcor* is the definition of overstatement.

Moreover, had the *Stolt-Nielsen* Court determined that the court, rather than an arbitrator, is the proper decision-maker of the arbitrability of class claims, its own decision would have been very different than the decision it wrote – the Court would have remanded the case to the District Court to decide the issue *de novo* or itself would have reviewed the issue *de novo*. However, the *Stolt-Nielsen* Court did neither of these. Instead, consistent with the position that the arbitration panel in that case was the proper decision-maker on the issue of arbitrability of class claims, the *Stolt-Nielsen* Court decided the case, not under a *de novo* review, but on the ground that the arbitration panel had exceeded its authority under § 10(a)(4) of the FAA – two very different standards of review. The lack of a *de novo* review and its finding that § 10(a)(4) was violated shows conclusively that the *Stolt-Nielsen* court did not intend to assign the class arbitrability

14

determination to the court rather than the arbitrator.

 *Stolt-Nielsen* in no way overturned the holding of *Pedcor*.  In *Pedcor*, the Fifth Circuit wrestled with the same fragmented *Bazzle* opinion discussed in *Stolt-Nielsen* and noted the plurality opinion and its genesis.  After thoroughly analyzing the plurality opinion coupled with Justice Stevens' concurrence, the Fifth Circuit held that the class arbitrability determination is a matter of contract interpretation for the arbitrator and not the courts to decide.  *Pedcor Mgt Co. Inc. Welfare Benefit Plan v. Nations Personnel of Texas, Inc*., 343 F.3d 355, 358-59 (5th Cir. 2003) ("Justice Stevens did express his agreement, however, with the principle laid down by the plurality that arbitrators should be the first ones to interpret the parties' agreement. As a result, the plurality's governing rationale in conjunction with Justice Stevens's support of that rationale substantially guides our consideration of this dispute.")  Nothing in *Stolt-Nielsen* disturbs the conclusion of the *Pedcor* court, and that decision is binding on this court.[9]  Consequently, the Arbitrator had the authority to interpret the contract language at issue in this case, and properly executed that authority in the Award.[10]

---

[9]     CSA's argument that *Granite Rock v Int'l Brotherhood of Teamsters*, 130 S. Ct. 2847 (2010) "put to rest any dispute about who is the appropriate decisionmaker" (Defendant's Motion at p. 8), demonstrates a complete misunderstanding (or misrepresentation) by CSA of both the history and structure of the court's gateway functions with regard to arbitration decisions at the very least since *Bazzle* and *Pedcor*.  *Granite Rock* did nothing more than cite to and quote the well-established and unremarkable gateway functions of a court when faced with an arbitration agreement:  1) to decide "whether the parties have agreed to submit[t] a particular dispute to arbitration," 130 S.Ct. 2885, and 2) to decide disputes concern[ing] contract formation."  *Id.*  Both of these gateway functions are "well settled," *id.,* and both existed well before and continue to exist well after *Bazzle* and *Pedcor*.

 Indeed, both gateway functions are mentioned specifically in both *Bazzle* and *Pedcor*.  *Pedcor* put it like this: "[T]he plurality [in *Bazzle*] reasoned that there exists only a narrow exception for certain gateway matters that parties normally expect a court rather than an arbitrator to decide, which include 1) 'whether the parties have a valid arbitration agreement at all' and 2) 'whether a concededly binding arbitration clause applies to a certain type of controversy.'"  *Pedcor*, 343 F.3d at 359.  Like in *Bazzle* and *Pedcor*, the question whether a contract permits class arbitration "concerns the '*kind of arbitration proceeding* the parties agreed to' and not 'the validity of the arbitration clause [] or its applicability to the underlying dispute between the parties,'" as CSA now mischaracterizes. Consequently, *Bazzle* and *Pedcor's* holding that arbitrators are "well situated to answer that question" remains undisturbed by *Granite Rock*. *Id.*

 This historical background makes clear that the language to which CSA cites in *Granite Rock* is neither new nor groundbreaking.  And it certainly does not operate to overturn, disturb, or even clarify either *Bazzle* or *Pedcor*, neither of which it even cites.

[10]     Should this Court determine that the authority to interpret the contract language in this case as to arbitrability of class claims belongs to it, rather than the arbitrator, this Motion to Vacate is not the proper motion upon which to

**E.**     **Manifest Disregard is Not a Proper Ground for Review of the Arbitrator's Decision**

The Fifth Circuit has expressly held that "to the extent that manifest disregard of the law constitutes a nonstatutory ground for vacatur, it is no longer a basis for vacating awards under the FAA." *Citigroup Global Markets, Inc. v. Bacon*, 562 F.3d 349, 355 (5th Cir. 2009).   Given that "manifest disregard" had previously existed in the Fifth Circuit solely as a "nonstatutory" basis for vacating arbitration awards, *see Kergosien v. Ocean Energy, Inc.*, 390 F.3d 346, 353 (5th Cir. 2004), *Bacon* makes clear that it is no longer a valid basis for challenging arbitration awards in the Fifth Circuit and that the statutory bases in the Federal Arbitration Act are now the <u>exclusive</u> means for challenging an arbitration award in the Fifth Circuit.  *Bacon*, 562, F.3d at 355.

Respondent argues that *Stolt-Nielsen* has revived "manifest disregard" as a basis for challenging an arbitration award.  Respondent's reading of *Stolt-Nielsen* is little more than wishful thinking.  The Court in *Stolt-Nielsen* did not base its decision on "manifest disregard."  Rather, the *Stolt-Nielsen* Court specifically based its decision on § 10(a)(4) of the FAA.  Responding to a "manifest disregard" argument by one of the parties, the Supreme Court specifically stated that "We do not decide whether 'manifest disregard' survives our decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 585 (2008), as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10."  The Court then went on to say that assuming, *arguendo*, that such a standard supplies, it would be satisfied by the Court's reasoning under FAA § 10(a)(4).[11]

The law of the Fifth Circuit remains clear.  The FAA is the *exclusive* basis for challenging

---

undertake a *de novo* review of the underlying question.  The only relief sought in this Motion is the vacatur of the Arbitrator's Contract Construction Award.  Moreover, even if Respondent's Motion to Vacate and for Stay *could* also be interpreted as a request that this Court conduct a *de novo* review of the underlying issue, such a request would violate the single Motion rule – that each Motion contain but a single Motion.  Thus, should this Court determine that it has the authority to interpret the contract language in this case as to arbitrability of class claims, the proper course of action is for the Court to require Respondent to file another Motion so that the parties have a full opportunity to brief the underlying issue for this Court.

[11]     In this respect, "manifest disregard" acts like a lesser included offense to § 10(a)(4);  violating the statute automatically meets the standard for "manifest disregard."

arbitration awards in the Fifth Circuit and manifest disregard is no longer a basis for vacating an arbitrator's award. *Citigroup Global Markets, Inc. v. Bacon*, 562 F.3d 349, 355 (5th Cir. 2009). The Supreme Court did not disturb *Bacon*'s ruling by refusing to decide an issue not directly before it.

**F.** **Even Were the Court to Apply a Manifest Disregard Analysis, the Arbitrator's Contract Construction Award Must be Upheld**

While, as noted above, "manifest disregard" does not exist as a basis for vacatur in this Circuit, even were this Court to apply such a standard, the Arbitrator's Award, must be upheld.

Contrary to the arguments raised by CSA, manifest disregard for the law "means more than error or misunderstanding with respect to the law." *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 381 (5th Cir. 2004). "The arbitrator[] must have appreciated the existence of a clearly governing principle but decided to ignore or pay no attention to it." *Id.* at 381-82. Furthermore, "the governing law ignored by the arbitrator[] must be well defined, explicit, and clearly applicable."

CSA essentially argues that the Arbitrator got it wrong. However, "getting it wrong" does not constitute manifest disregard. *Id.* CSA simply cannot and does not demonstrate that the Arbitrator "ignored" any governing law. To the contrary, he considered the governing law and CSA disagrees with his conclusions.

The Arbitrator cited and interpreted *Stolt-Nielsen*, the arbitration agreement, and Texas law in reaching his decision. As such, the Arbitrator did not "manifestly disregard the law" in determining that the arbitration agreement in this case allowed for the arbitration of class and collective claims.

Judge Lynn of this Court faced a similar argument in *NetKnowledge Technologies, L.L.C. v. Rapid Transmit Technologies, a/k/a/ WaKuL, Inc.*, 2007 WL 518548 (N.D. Tex. Feb. 20,

2007).[12]  In that fraudulent inducement case, she stated:

> Even if the Court found that *Schlumberger [Technology Corp. v. Swanson* 959
> S.W.2d 171 (Tex. 1997)] did represent such a clearly governing principle, Ericsson
> has failed to show that the Arbitrator "decided to ignore or pay no attention to it."
> The Arbitrator cited and interpreted the case in reaching his conclusion . . . . Since
> the Arbitrator explicitly considered both "the language and structure" of the MPA
> and the *Schlumberger* decision in determining that the MPA's merger clause did not
> bar the fraudulent inducement claim, the Court finds that the Arbitrator did not
> manifestly disregard the law in awarding damages to WaKuL for a fraudulent
> inducement claim.

Similarly, the Arbitrator in this case considered the language and structure of the arbitration

agreement in reaching his decision, thus eliminating any grounds for vacatur.

**G.    CSA's Merits Arguments Contained in Its Manifest Disregard Analysis are Irrelevant
        and Incorrect**

    **1.    The Arbitrator's Reading of the Broad Language of the Arbitration
            Agreement was Correct**

CSA attempts to refute the Arbitrator's finding that the use of language which so broad it is

"difficult to imagine broader language" supports a finding that the parties intended to arbitrate all

disputes of every kind (even disputes that might involve collective or class arbitration), solely

through its own unsupported claim that this language was intended to encompass only *substantive*

claims and not procedural ones.   Initially, this distinction between substantive and procedural

claims is not in the language itself and is an artificial, after the fact, unilateral interpretation by

CSA.  Moreover, the *Stolt-Nielsen* Court itself refutes the application of such a distinction:

> In certain contexts it is appropriate to presume that the parties that enter into an
> arbitration agreement *implicitly* authorize the arbitrator to adopt such procedures as
> are necessary to give effect to the parties' agreement.  Thus, we have said that " '
> "procedural questions which grow out of the dispute and bear on its final
> disposition' are presumptively not for the judge, but for an arbitrator, to decide. . . .
> This recognition is grounded in the back ground principle that "[w]hen the parties to
> a bargain sufficiently defined to be a contract have not agreed with respect to a term
> which is essential to a determination of their rights and duties, a term which is
> reasonable in the circumstances is supplied by the court.  *Restatement (Second) of*

---

[12]        Of course, *NetKnowledge* was decided before the Fifth Circuit's decision in *Bacon*, finding that "manifest
disregard" is no longer a valid basis for vacatur of arbitration awards.

*Contracts § 204 (1979).*

> An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may *infer solely* from the fact of the parties' agreement to arbitrate.

*Stolt-Nielsen*, 130 S. Ct. at 1775 (emphasis added).

Thus, the *Stolt-Nielsen* Court clearly foresaw that arbitrators would infer not only substantive claims, but procedural ones as well. CSA's argument that the arbitration agreement is limited to substantive claims runs directly contrary to that finding and is not supported in the language itself.

Next, CSA erroneously contends that other courts interpreting the "any" and "all" language render the Arbitrator's interpretation improper under the circumstances in this case. (Motion at p. 19). CSA's rhetorical question as to why the same language in *Stolt-Nielsen* did not result in class arbitration was addressed supra at footnote 7. Simply put, the parties in *Stolt-Nielsen* stipulated there was "no agreement" in the agreement. Further, CSA's use of an advisory opinion from the Southern District of New York, *Jock v. Sterling Jewelers, Inc.*, 2010 WL 2898294 (S.D.N.Y. July 26, 2010), is inapposite. First of all, the *Sterling* opinion is merely advisory, or as the Court terms it, "indicative." *Id.* at *1. At the time this opinion was issued, the case was already on appeal from a prior pre-*Stolt-Nielsen* decision upholding the Arbitrator's award, and thus the District Court did not have jurisdiction at the time it issued this "indicative" opinion, indicating how it would rule if it did have jurisdiction post-*Stolt-Nielsen.* Moreover, the arbitrator's decision in *Sterling* was issued pre-*Stolt-Nielsen*, unlike the award in this case which was issued after that Supreme Court ruling and guided by its instructions. The *Sterling* arbitrator had ruled under then-applicable Second Circuit precedent that, because the agreement did not prohibit class arbitration, class arbitration could proceed. Conversely, the Arbitrator in the present matter ruled, *after Stolt-Nielsen*, and specifically following that case's directives, that a contractual basis existed to find that the parties

had agreed to class and/or collective procedures.  Finally, *Sterling* is factually distinguishable in important ways that prevented the contract in *Sterling* from providing a basis for such a finding, such as 1) requiring that each arbitration be held near where the employee worked, and 2) requiring that the arbitrator apply local law, each of which the *Sterling* court found inconsistent with an intent to include class claims.  *Id.* at \*6.

Because the Arbitrator's post-Stolt-Nielsen analysis is on solid ground and based on the facts of the agreement in <u>this</u> case, the Motion to Vacate should be denied.

### 2. CSA's Argument That The Arbitrator Improperly Relied on § 204 of the Restatement (Second) of Contracts is Refuted by *Stolt-Nielsen*.

CSA argues the Arbitrator improperly relied on § 204 of the Restatement (Second) of Contracts in his award.  However, as the above-quoted language from *Stolt-Nielsen* makes perfectly clear, it is entirely proper for arbitrators to use § 204 to infer an implicit agreement to authorize class-action arbitrations.  *Id.*  They simply cannot do so based *solely* from the fact of the parties' agreement to arbitrate – which the Arbitrator in this matter clearly did not do. Accordingly, the Arbitrator's reliance on § 204 of the Restatement (Second) of Contracts was proper.

### 3. The Arbitrator's Use of *Expressio Unius Est Exclusio Alterius* was Proper.

It is CSA, not the Arbitrator, that fundamentally misapprehends the EUEEA doctrine.  CSA argues the Arbitrator's use of the EUEEA doctrine enlarges a class of things – any and all disputes – rather than placing limits around it.  First, given the extremely broad nature of the phrases "any" and "all" disputes, it is arguable that nothing the Arbitrator could use would enlarge the class of things included therein.  More fundamentally, however, the phrase to which the Arbitrator applies the EUEEA doctrine is not "any and all disputes," but the exclusionary phrase in the arbitration agreement.  The application of the EUEEA doctrine *does* in fact place limits on that phrase to which it is applied – limiting the exclusionary phrase to intellectual property disputes and

preserving the intentional breadth of the "any" and "all" disputes language.

Finally, the Arbitrator's award does not, as CSA attempts to argue, suggest that CSA would have to expressly prohibit class arbitration to avoid class arbitration. A fair reading of the Award does not allow such a conclusion. Instead, the Arbitrator clearly interpreted the contract language as broad enough to include class arbitration and noted that in an exclusionary clause – which CSA *chose* to include – class and/or collective arbitration was not included.

The Arbitrator did not find that an exclusionary clause was necessary for CSA to avoid arbitration. Indeed, it was CSA itself that chose to include an exclusionary clause in the first instance. Once CSA had included such a clause, however, it became part of the arbitration agreement that the Arbitrator was bound to interpret. Consequently, the Arbitrator did not manifestly disregard the law on this issue and the request to vacate should be denied.

### 4.     CSA's Election to Compel a Collective Action to Arbitration Shows its Intent to Proceed in Arbitration on Collective Basis

In support of his analysis that it was the intent of the parties to require the arbitration of an FLSA collective action, the Arbitrator notes that, CSA compelled a collective action to arbitration at the time it asked the Court to stay the proceedings. (Exh. D, p. 8). Plaintiff Benson filed his Original Complaint in this Court as a "collective action" pursuant to the provision of the FLSA which authorizes such representative actions. 29 U.S.C. § 216(b). This section of the U.S. Code (as opposed to the Federal Rules of Civil Procedure) authorizes FLSA lawsuits to be brought "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."[13]  *Id.*  At the time the motion to compel was filed, CSA had been served with notice that at least one other individual (Linda Francis) had joined the action as an opt-in Plaintiff.

---

[13]      Notably, Section 216(b) refers to the ability to proceed "by or on behalf of any employee" as a "right." A collective action is a distinctly different creature from a Rule 23 class action. CSA's new position that a collective arbitration (as opposed to a class arbitration) was not authorized, fails to address the "right" to bring a collective action, which is easily an imputed terms in the agreement unless expressly waived.

Doc. Entry No. 5.  By the time the Motion to Compel Arbitration was granted, yet another individual had opted in (Mark Woodson).  Doc. Entry No. 13.

CSA did not separately move to compel Benson, Francis, and Woodson to arbitration or demand that they file separate arbitration proceedings.  CSA moved to compel the entire action - styled as a collective action and joined by two additional opt-in plaintiffs - to arbitration.  If CSA believed that a collective action was outside the scope of its agreement, it would have moved to separately compel each person to arbitration.  It did not.  CSA sought to stay the entire case as plead.  The Arbitrator thought CSA's actions to be indicative of its intent to include collective actions in the scope of the arbitration agreement.  Here again, the Arbitrator based his decision about the scope of the arbitration agreement on something other than the mere agreement to arbitrate.  CSA's actions, and the inference to be drawn therefrom, show the Arbitrator's decision was anything but manifest disregard for the law.

Further, when Plaintiff filed his Demand for Arbitration (Exh. A), he included his collective action allegations and added the more familiar opt-out class allegations and a claim for violation of the Texas Labor Code to his demand.  CSA never moved to strike the collective or class allegations.  Since the arbitration demand has been filed, over 80 additional individuals have filed consents to participate as opt-in plaintiffs in the arbitration.  (Exh. E, Consents Filed in Benson Arbitration).  Never once has CSA complained about these filings as being outside the scope of what was being arbitrated.  Never once as these filings have been made has CSA insisted that the individual opt-ins be required to file separate suits or separate arbitrations.  The reason for CSA's silence is that CSA always intended to permit, at the very least, the FLSA opt-in, collective action to proceed in arbitration because it believed such an action was within the scope of the arbitration agreement.  As Benson noted in his Clause Construction Memorandum and in his Reply (Exh. B at 13, fn 11; Exh. C at 16, fn 5), CSA's former counsel represented to the Arbitrator as part of the

briefing scheduling hearing that CSA did not oppose the case proceeding as an opt-in collective action, but disagreed that an FLSA action could proceed as an opt-out case under opt-out procedures like those in Rule 23 of the FED.R.CIV.P. Prior to *Stolt-Nielsen*, CSA took the position that an FLSA collective action was arbitrable under the terms of the arbitration agreement it drafted. It has only been since *Stolt-Nielsen* that CSA has decided that its agreement does not mean what it says or no longer means what it previously understood it to say and represented to the Arbitrator it says. The Arbitrator was correct to review and assess CSA's actions in compelling arbitration of the underlying collective action as a basis for the Arbitration Award.[14]

5.      **The Arbitrator's Decision <u>Prevents</u> Significant Injustice to CSA Rather Than Causing It.**

CSA contends it will suffer "significant injustice" if a class or collective arbitration process is permitted. CSA wrongfully analyzes the issue one last time. The purpose behind arbitration is to simplify disputes, reduce costs, and streamline resolution. This is also the purpose of collective actions, class actions and class arbitrations. The claims of the class members do not disappear because there is no class arbitration. The claims get filed as separate actions, possibly with separate counsel, in separate jurisdictions, with the possibility of inconsistent outcomes and little efficiency. Currently, there are 85 individuals who have elected to participate in the arbitration. More will likely join as the case proceeds. It is less efficient, more costly, and less streamlined to conduct 85 (or more) separate arbitrations than to conduct a single proceeding that resolves the underlying liability question for the entire class.

---

[14]      CSA's only argument on this issue is its rhetorical question concerning how it was supposed to proceed other than how it did. CSA erroneously asserts it had no choice but to compel the entire action to arbitration. That is not so. CSA easily could have moved to separate the claims of the three participants in the case from one another before compelling arbitration or as part of doing so. CSA could have also asked the Court enter an order requiring that each of the three individuals file his or her own demand for arbitration as opposed to allowing Francis and Woodson to file as opt-in claimants with Benson as the lead claimant in the arbitration. Finally, CSA's Motion to Vacate argues that *Bazzle* has always been convoluted and therefore misapplied by *Pedcor*. If this was CSA's position all along, it could have asked the Court to determine whether the collective action allegations and the collective action provisions of the FLSA were or were not included in the arbitration agreement and then appealed that issue if it was unsuccessful. Instead, CSA asked the arbitrator to make the decision and now does not like the outcome.

The issue in the present case is whether CSA properly classified its Debt Consultants as exempt from the overtime requirements of the FLSA.  Because CSA applied the exemption across the board to its Debt Consultants, what could be simpler than making a merit-based determination for an entire class of identically treated employees?  Allowing the arbitration to proceed on a collective or class basis reduces CSA's litigation costs and prevents the injustice that results from CSA defending a multitude of individual actions.  CSA wanted the efficiency of arbitration applied to a collective action or a class action and failed to exclude such actions from arbitration when it knew how to draft exclusionary language to reign in its intentionally broad arbitration agreement. The only significant injustice to CSA would be preventing it from efficiently resolving the underlying FLSA exemption issue by vacating the Arbitrator's decision.

**H.      CSA's Request to Stay Should Be Denied.**

CSA's request for a stay under 9 U.S.C. § 12 must also be denied by the terms of that statute.  Section 12 allows the Court to enter an order "staying the proceedings of the adverse party to enforce the award."  Moreover, such an order must be "served with the notice of motion [to vacate, modify or correct an award]."  Here, Benson has not filed a separate action or a cross motion to enforce the Award such that a stay should be entered.  CSA has also failed to serve Benson with such an order as directed by the statute.

A stay is also inappropriate unless the statute of limitations is tolled for absent class members.  Under the FLSA, if the arbitration proceeds as an opt-in collective action, the statute of limitations for similarly situated individuals does not stop running until the individual files a consent to opt into the case pursuant to 29 U.S.C. § 216(b).  Such consents are generally obtained in response to a notice approved by the court or arbitrator.  CSA's request to stay the arbitration proceedings has already been denied by the Arbitrator and this Court should do likewise.  Delaying

the arbitration would effectively prejudice absent class members[15] or deprive them of their rights to participate in this case and achieve the benefits of a collective action proceeding as outlined in *Hoffmann-LaRoche, Inc. v. Sperling*, 493 U.S. 165 (1989).  Consequently, the Court should deny the Motion to Vacate.

## IV.    CONCLUSION

The Arbitrator's decision is well-grounded in the language of the contract and Texas law, complies with *Stolt-Nielsen*, and is made by the right decision maker.  There are no grounds to delay this process any further.  For the reasons set forth herein, the Court should deny CSA's Motion to Vacate and decline its improper invitation to stay this matter pending appeal.

---

[15]    For example, an individual who worked at CSA from September 1, 2007 to June 1, 2008 would have 10 months of potential liability against CSA.  If this case is stayed without tolling and the final decision from the Fifth Circuit on the Clause Construction matter is issued 18 months from now, the individual will not be able to participate on an opt-in basis in this arbitration because the claim would be time barred.  Even without considering whether an individual is completely barred from participating, for a former employee, every week that passes is another weeks' pay that is lost absent a tolling order.  Because of the potential harmful effect on the absent class members of an extensive stay, Benson opposes the request to stay.  If the Arbitrator's Award is ultimately overturned (which it should not be), individual participants in the Arbitration can be apportioned into separate cases without impacting their rights under the FLSA.